**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Case No. 16-cv-00570-RM-KMT

STEPHEN LAWTON,

     Plaintiff,

v.

HOTSPUR SPORTS COMPANY, INC., *et al.*,

     Defendants.

---

## OPINION AND ORDER

---

On March 8, 2016, plaintiff Stephen Lawton ("plaintiff") filed a Complaint against

defendants Hotspur Sports Company, Inc. ("Hotspur"), Charter Sports, Inc., Charter Sports Blue Sky,

and Charter Sports (collectively, "defendants"),[1] alleging state law claims of negligence, strict

liability, and breach of warranty, arising out of injuries sustained after a skiing accident on March 9,

2014. (ECF No. 1.) On February 10, 2017, plaintiff filed a motion to amend the complaint ("the

motion to amend") (ECF No. 27), which, after a report and recommendation (ECF No. 45), the Court

granted in part and denied in part (ECF No. 58), allowing plaintiff to amend his complaint to add a

further state law claim of gross negligence.

---

[1] At the outset, the Court notes a modicum of confusion on its part concerning the defendants fighting this case. The Complaint (and Amended Complaint) was filed against all of the defendants, alleging that Hotspur may do business under the names of the other three defendants. (*See* ECF No. 1 at ¶ 5.) The instant motion for summary judgment was filed by only Hotspur, although Hotspur calls itself "Charter" throughout the motion. (*See, e.g.*, ECF No. 32 at 1.) In response, plaintiff also only mentions the name Charter in discussing the defendants. (*See generally* ECF No. 37.) Because Hotspur is the party that filed the motion for summary judgment, the Court refers to Hotspur throughout in this Opinion, rather than Charter or any other trade name that Hotspur may use. Should this case proceed any further, the parties will be required to clarify whether the non-Hotspur defendants are needed in this case and/or whether any relief granted with respect to the motion for summary judgment applies also to the non-Hotspur defendants.

Pending before the Court is Hotspur's motion for summary judgment ("the motion for summary judgment") (ECF No. 32) and statement of undisputed material facts (ECF No. 33-12). Plaintiff has filed a response in opposition to the motion for summary judgment (ECF No. 37), and a response in opposition to Hotspur's statement of undisputed material facts (ECF No. 37-1). Hotspur filed a reply (ECF No. 40) and a reply statement of undisputed material facts (ECF No. 39). In addition, after instruction in the report and recommendation with respect to the motion to amend, Hotspur filed a supplement to its motion for summary judgment to address plaintiff's gross negligence claim ("the supplement") (ECF No. 49), as well as a supplement to its statement of undisputed material facts (ECF No. 50). Plaintiff has filed a response to Hotspur's supplement (ECF No. 54),[2] as well as a response statement of supplemental undisputed material facts (ECF No. 55).

I.      **Legal Standard for Summary Judgment**

Summary judgment is appropriate "when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Initially, the movant bears the "responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986). If this burden is met, then the non-moving party must set forth specific facts showing that there is a genuine dispute for trial. *Id*. at 324. A fact is material if it has the potential to affect the outcome of a dispute under applicable law. *Ulissey v. Shvartsman*, 61 F.3d 805, 808 (10th Cir. 1995). An issue is genuine if a rational trier of fact could find for the non-moving party. *Adams v. Am. Guarantee & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000).

_____

[2] Plaintiff appears to have filed the same response to Hotspur's supplement twice, as the document that appears at ECF No. 54 appears to be replicated at ECF No. 56. The Court cites to ECF No. 54.

In performing this analysis, the factual record and any reasonable inferences therefrom are construed in the light most favorable to the non-moving party. *Id*. However, a mere "scintilla of evidence" is insufficient to avoid summary judgment. *Turner v. Public Service Co. of Colorado*, 563 F.3d 1136, 1142 (10th Cir. 2009). Instead, a non-movant "must proffer facts such that a reasonable jury could find in her favor." *Id*.

## II.    Discussion[3]

The Court addresses the arguments and claims at issue in the motion for summary judgment, and then the arguments and claim at issue in the supplement. In the motion for summary judgment, Hotspur raises four grounds for why summary judgment should be entered in its favor. First, Colo. Rev. Stat. § 13-21-402 bars all of plaintiff's claims because they are product liability claims and Hotspur was not a manufacturer of the skis rented to plaintiff. (ECF No. 32 at 7-9.) Second, plaintiff fails to state a prima facie claim for strict products liability because this case does not involve a defective product. (*Id*. at 9-10.) Third, the undisputed evidence contradicts plaintiff's negligence claim because the bindings on his skis released as they were designed to do. (*Id*. at 2-4.) Fourth, plaintiff's negligence and breach of warranty claims are barred by an exculpatory clause in an agreement plaintiff executed before renting his skis. (*Id*. at 5-7.)

### A.    Product Liability (Issues 1 and 2)

If this case is anything it is not a product liability action. A simple perusal of the Complaint and the evidence presented for summary judgment demonstrates this. Notably, both parties agree that the piece of equipment at issue in this case—the bindings on plaintiff's skis—were not defective and functioned appropriately. (*See* ECF No. 40 at 14; ECF No. 37 at 6.) Why plaintiff alleged

---

[3] The pertinent undisputed facts are set forth in the Court's discussion.

claims in his Complaint that defendants acted negligently in adjusting the settings of the bindings *and* the bindings were defective and/or not fit for purpose, the Court does not know. Perhaps plaintiff wanted to keep his options open. But, now that the evidence is in, it clearly shows at least one thing—the bindings were not defective or unfit for their purpose. (*See* ECF No. 37-1 at ¶ 42.) Oddly, perhaps due to the somewhat conflicting nature of plaintiff's claims, both parties in their summary judgment papers end up arguing against themselves. In other words, both parties argue that the bindings were, at the same time, both not defective (ECF No. 40 at 14; ECF No. 37 at 6) and defective (ECF No. 32 at 9; ECF No. 37 at 16). This is perhaps best illustrated by the arguments in the motion for summary judgment, in that Hotspur argues, on the one hand, that all three of plaintiff's claims state product liability claims, and, on the other hand, this case does not involve a defective product. (*See* ECF No. 32 at 9-10.) In summarizing Hotspur's arguments, plaintiff himself shows the conflicting nature of his claims: "In arguing that Plaintiff[] does not state a strict liability claim, [Hotspur] itself argues that Plaintiff's claims, including the strict liability claim, are really just simple negligence claims." (*See* ECF No. 37 at 17.)

To set this case straight, the Court agrees that plaintiff's claims (at least in the original Complaint) "are really just simple negligence claims."[4] It is for this simple reason that plaintiff's argument that Hotspur is a "manufacturer" for purposes of the Colorado Product Liability Act is wrong too. Plaintiff argues that a "manufacturer" is anyone who sells a product with actual knowledge of a defect in the product, and Hotspur had actual knowledge that mis-adjusted bindings could cause a premature release. (ECF No. 37 at 16.) Plaintiff, though, makes no effort to explain

---

[4] This discussion of plaintiff's original claims should not be construed as passing judgment on plaintiff's amended Complaint and the new claim of gross negligence.

why this kind of knowledge represents knowledge of a defect in the ski bindings. And the Court cannot understand how it would. Apparently, neither can plaintiff, given that, earlier in the response, plaintiff asserts that his release from the bindings "on the day of the accident [was] not due to a design flaw in the bindings but, rather, to their improper adjustment, such as incorrect DIN settings or incorrect forward pressure settings." (*See id*. at 6.) Simply put, setting a product improperly, just like using a product improperly, does not render that product defective. As a result, Hotspur was not aware of a *defect* in the ski bindings, and thus, Hotspur was not a "manufacturer" for purposes of the Colorado Product Liability Act.

The result of all of these conflicting arguments and claims is that the Court GRANTS the motion for summary judgment with respect to plaintiff's breach of warranty and strict product liability claims because Hotspur is not a "manufacturer" under the Colorado Product Liability Act, and thus, cannot be held liable on a product-liability theory. *See* Colo. Rev. Stat. § 13-21-402(1).[5] However, the Court rejects Hotspur's argument that plaintiff's simple negligence claim should be dismissed on a similar basis because that claim clearly does not sound in product liability, and thus, the Colorado Product Liability Act does not apply to it.

B.      **Simple Negligence**

1.      **The Evidence**

Hotspur argues that undisputed evidence shows that the bindings on the skis plaintiff rented were appropriately set, and thus, it did not act negligently in setting the bindings. (ECF No. 32 at 2-4.) Plaintiff responds that there is "significant disagreement" about whether his release from

---

[5] Although Hotspur's fourth argument—that plaintiff cannot make a prima facie claim—applies only to the strict product liability claim, Hotspur's third argument concerning Colo. Rev. Stat. § 13-21-402 applies to plaintiff's breach of warranty claim, and the Court agrees that the breach of warranty claim is one sounding in product liability. (*See* ECF No. 1 at ¶¶ 45-47.)

the ski bindings was proper, including over the settings on the bindings at the time plaintiff rented the pertinent skis. (ECF No. 37 at 4-6.) The Court agrees with plaintiff.

From Hotspur's perspective there are only a few pertinent pieces of evidence to this question. None of them, though, are as clear cut as Hotspur believes. Hotspur first cites the "rental form" used for the rental of the skis. (ECF No. 32 at 3.) Hotspur asserts that it selected a visual indicator setting of "8" for the skis. (*Id*.) For present purposes, this is inaccurate for two reasons. First, the rental form contains entries for four different settings: the left and right toe, and the left and right heel. (ECF No. 32-5 at 2.) Although the settings for the left and right toe appear to be "8s", the settings for the left and right heel appear, at least for summary judgment purposes, to be "5s", which would undermine Hotspur's argument that the heel settings were appropriately set.[6] Second, the rental form, as originally filled out, pertained to skis with the identifying number of 13 KAR 167-20. (*See id*.) The evidence shows that the 13 KAR 167-20 skis were returned on March 8, 2014, and plaintiff was issued a different pair of skis with the identifying number 12 KR 174-8. (ECF No. 39 at ¶¶ 19-20.) There is no indication from the rental form itself, though, that the 12 KR 174-8 skis had the same settings as the 13 KAR 167-20 skis.

Hotspur next cites the deposition testimony of Paul Wride, one of Hotspur's employees, that, when the 12 KR 174-8 skis were returned following the accident, Wride performed a visual inspection of the same and the bindings were all set at "8". (ECF No. 32 at 3.) Wride's testimony is perhaps one of the more persuasive pieces of evidence in Hotspur's favor, as it is contemporaneous with the return of the skis after plaintiff's accident. That being said, it does not mean that plaintiff cannot offer opposing evidence of the settings on the bindings. Through the

---

[6] It is undisputed that "8" was the appropriate visual indicator setting for plaintiff. (ECF No. 39 at ¶ 34.)

testimony of Seth Bayer, which the Court has now allowed, plaintiff has done so.[7] Notably, Bayer has opined that the probable cause for plaintiff's release from the bindings was that either the visual indicator setting or the forward pressure setting were inappropriately set. (ECF No. 30-1 at 7.)[8] If it was the visual indicator setting, although this would contradict Wride's testimony, a jury would not be compelled to accept Wride's account if it believed Bayer's testimony, especially given that Wride's account was never memorialized in writing at the time.

If it was the forward pressure setting, this would not contradict Wride's testimony about the visual indicator setting. Instead, it would contradict another piece of evidence upon which Hotspur relies—the deposition testimony of its employee David Tunison, who evaluated the 12 KR 174-8 skis the day after plaintiff's accident, and ticked a "Yes" box on the evaluation form that the forward pressure was correct. (*See* ECF No. 37-10 at 8.) Again, though, a jury would not be required to accept that the forward pressure setting on the skis was correct if it believed Bayer, and even more so given that Tunison's inspection occurred a day after the accident. (*See id*.)

Hotspur also cites testimony from plaintiff's brother-in-law, Peter Markes, and Bayer for the proposition that the bindings released because plaintiff fell or pitched forward. (ECF No. 32 at 4.) However, assuming plaintiff fell forward, that does not mean this motion caused plaintiff's release. Instead, plaintiff's release could have caused him to fall forward. In that regard, the Court does not construe Bayer's testimony as stating otherwise. Although Bayer used the words "before he was

---

[7] As a result, the Court will not repeat its findings rejecting Hotspur's arguments against the admission of Bayer's testimony. To the extent Hotspur raises those same arguments in its motion for summary judgment or reply, the Court rejects them for the same reasons stated in its earlier Opinion allowing Bayer to testify.

[8] The Court notes that it is not abundantly clear whether plaintiff's accident could have occurred if the visual indicator setting was correctly set but the forward pressure setting was not or vice versa, or if plaintiff's accident required both settings to be incorrectly set.

ejected from his skis," that appears related to Bayer's explanation of the direction plaintiff traveled after his release, rather than Bayer's use of the term "pitched forward." (*See* ECF No. 32-2 at 30:9-11.) Moreover, with regard to Markes' testimony, although he stated that he saw plaintiff "falling kind of forward," that was after Markes heard plaintiff yell (*see* ECF No. 32-6 at 52:25-53:4), suggesting that plaintiff fell forward after whatever event caused him to yell out.[9]

In this light, the Court does not find the evidence to be undisputed as to whether the bindings on plaintiff's skis were properly set when plaintiff rented the skis. Instead, the evidence could be construed in either plaintiff's or Hotspur's favor on this issue, which is precisely when summary judgment is not warranted. As a result, the Court rejects Hotspur's arguments in this regard.

## 2.    The Exculpatory Clause

Hotspur argues that plaintiff's negligence claim is barred by an exculpatory clause in the rental form, which provided that the renter of listed equipment released Hotspur from any and all liability and claims arising from the use of the equipment, including negligence claims. (ECF No. 32 at 5-6.) Plaintiff responds that the exculpatory clause does not apply because the equipment listed on the rental form at the time plaintiff signed the form was the 13 KAR 167-20 skis, not the 12 KR 174-8 skis. (ECF No. 37 at 8-11.) Plaintiff also argues that the exculpatory clause is ambiguous, and thus, should not be enforced, citing *Stone v. Life Time Fitness, Inc.*, ___ P.3d ___, 2016 WL 7473806 (Colo. App. Jan. 12, 2017), and *Rowan v. Vail Holdings, Inc.*, 31 F. Supp. 2d 889 (D. Colo. 1998). (*Id*. at 11-13.) The Court disagrees with plaintiff's latter argument, but finds that there are disputed questions of fact with respect to the former.

---

[9] Hotspur also asserts that ski bindings are designed to release upon the application of sufficient twisting or forward lean forces during a fall. (ECF No. 32 at 4.) However, Bayer's expert report disputes that the bindings released due to twisting or a forward fall not precipitated by an ejection from the bindings. (*See* ECF No. 30-1 at 5-6.)

First, the exculpatory clause is not ambiguous, it is perfectly clear and understandable. The clause reads as follows.

> Renter is advised that a person using any of the facilities of the ski area is considered a skier. The undersigned acknowledges and understands that under Colorado Law, a skier **ASSUMES THE RISK of the inherent dangers and risks of skiing**. The ADULT acknowledges upon ADULT's and CHILD's behalf that falls and collisions occur and **INJURIES or DEATH** may result from participation in the sport of 'skiing.' ADULT hereby **ASSUMES ALL RISKS** associated with the ADULT'S or CHILD's participation in the sport of skiing, known or unknown, inherent or otherwise, including but not limited to, **injury and/or death** to the ADULT or CHILD, and **HEREBY RELEASES** Hotspur Sports Company, Inc. its subsidiaries, affiliates, directors, officers, employees and agents, as well as the equipment manufacturers and distributors (the "Released Parties") from **ANY AND ALL LIABILITY** and/or claims that the undersigned ADULT may be entitled to bring that arises from the ADULT or CHILD's use of this equipment, including claims based on **NEGLIGENCE OR BREACH OF WARRANTY**. The ADULT represents that ADULT **AGREES TO INDEMNIFY** and hold harmless the Released Parties from any and all claims of the ADULT arising in whole or in part from the ADULT's or the CHILD's use of this equipment.

(ECF No. 32-5 at 3 (emphasis and capitalization in original)). Although the font size of the clause is not large, it is the same size as all of the surrounding text, and notably contains many additions of bolded and capitalized words. *See Stone*, 2016 WL 7473806, at *4 (rejecting an exculpatory clause, in part, because it compelled resort to a "magnifying glass and lexicon). The clause also contains what the *Stone* court described as "legal jargon," but the Court does not understand how that renders the clause ambiguous. There is nothing ambiguous about the phrases "ASSUMES THE RISK" or "inherent dangers and risks of skiing," or the words "subsidiaries" and "affiliates." Although the word "indemnify" may be confusing or unclear, that alone does not mean that the entire clause becomes unclear.

As for the remaining considerations in *Stone*, plaintiff conveniently ignores all of them. Contrary to plaintiff's apparent contention, fine print and legal jargon alone do not render the

exculpatory clause ambiguous (*see* ECF No. 37 at 12), given that the *Stone* court discusses five further reasons for why the exculpatory clause at issue in that case was unclear or ambiguous. Here, the exculpatory clause does not contain misplaced language. *See Stone*, 2016 WL 7473806, at *4 (stating that the clause contained a heading "under Chapter 458, 459, 460, or Chapter 461 ASSUMPTION OF RISK," and explaining that the court's research had not enlightened it as to what the language referred). Next, the term "inherent dangers and risks" here applies to skiing—a dangerous or potentially dangerous activity. *See id.* at *5 (explaining that the clause in that case could apply to "more common situations, such as using locker rooms," even though a reader could reasonably conclude that they were only waiving claims based on risks related to fitness activities, and noting that skiing is a potentially dangerous activity). The exculpatory clause here is also clear as to what claims are being released; specifically, claims arising from use of the equipment listed in the rental form. *See id.* (explaining that the release language was confusing because it used the term "such injury" and that term referred back to a confusing assumption of risk clause). Finally, unlike *Stone*, the exculpatory clause does not "repeatedly use" phrases such as "includes," "including, but is not limited to," and "including without limitation." *See id.* at 6. To the extent this Court agrees that those words or phrases are confusing, they are not used repeatedly in the instant exculpatory clause. Rather, "including" is used once, and "including but not limited to" is used once.

Second, plaintiff's reliance upon *Rowan* is misplaced because, here, there is no conflict between the language of the exculpatory clause and Colorado's Ski Safety Act. Notably, in *Rowan*, the district court found that the exculpatory clause contained a conflicting release because it released a resort of all risks, including from the use of ski lifts, while also stating that a person assumed the inherent risks of skiing as set forth in Colorado's Ski Safety Act, which stated that using a ski lift

did not count as an inherent risk. *See Rowan*, 31 F. Supp. 2d at 899; *see also Cunningham v. Jackson Hole Mountain Resort Corp.*, 673 F. App'x 841, 846 (10th Cir. 2016) (explaining the nature of the conflict in *Rowan*). Here, there is no such conflicting language, and plaintiff does not point the Court to any particular conflict. (*See* ECF No. 37 at 13.) In addition, simply because the exculpatory clause sets forth the risks assumed under Colorado law, and then, separately, states what risks a person is assuming pursuant to the parties' agreement, does not make the clause ambiguous, especially given that, here, the release itself did not adopt the Ski Safety Act's understanding of assumed risks.

This leaves whether the exculpatory clause applies to the skis plaintiff rented. This issue involves interpretation of the rental form. As Hotspur appears to accept, as originally written, the terms of the rental form would not have covered the 12 KR 174-8 skis plaintiff used during the accident for the simple reason that those skis were not listed in the rental form originally. The exculpatory clause is clear that the release applies to "use of this equipment," and "this equipment," at least originally, was the 13 KAR 167-20 set of skis. (*See* ECF No. 32-5 at 2-3.) Perhaps accepting this, Hotspur argues in its reply that the parties modified the rental form. Specifically, Hotspur argues that contract provisions can be modified by course of performance or conduct, and the rental form was so modified when plaintiff returned the original set of skis, accepted the replacement set, and then used them. (ECF No. 40 at 8-9.) Plaintiff argues that the exculpatory clause should not be construed to encompass the replacement set of skis because Hotspur did not show plaintiff that the visual indicator settings on the replacement skis were the same as stated on the rental form, and thus, plaintiff could not agree that the settings were the same, which the rental form required plaintiff to do. (*See* ECF No. 37 at 13-14.)

The Court does not necessarily disagree with either limited reading of the rental form and/or the parties' conduct. Notably, as Hotspur contends, plaintiff returned to the rental store for a new set of skis, he received a new set, and then used them. It could be hard to suggest that plaintiff did so thinking that no agreement applied to plaintiff's use of the skis. On the other hand, as plaintiff contends, the rental form provides that the renter must agree that the setting numbers appearing on the skis correspond to the setting numbers recorded on the form. (*See* ECF No. 32-5 at 2.) Moreover, Hotspur does not properly refute plaintiff's assertion that, when he received the replacement skis, he was never shown the rental form, and thus, did not check the setting numbers. (*See* ECF No. 39 at ¶ 23(AF)).[10] Merely because plaintiff may have had the opportunity to check the visual indicator settings, does not necessarily mean that plaintiff agreed that those settings on the replacement skis corresponded to the numbers recorded on the rental form.

In Colorado, "[t]he existence of a contract or any modification or amendment thereto is a question of fact to be determined by consideration of all the circumstances." *Compton v. Lemon Ranches, Ltd.*, 972 P.2d 1078, 1080 (Colo. App. 1999). Moreover, when "the evidence is conflicting or admits of more than one inference, it is for the jury to decide whether a contract in fact exists." *I.M.A., Inc. v. Rocky Mountain Airways, Inc.*, 713 P.2d 882, 887 (Colo. 1982). In light of the disputed nature of the evidence and the parties' conflicting interpretation of the same, the Court finds that the issue, of whether the rental form was modified so to include the replacement set of skis (12 KR 174-8) as equipment listed in and subject to the terms of the rental form, is best left for a fact finder to resolve. As a result, the Court rejects Hotspur's argument that it is entitled to summary judgment on the ground that plaintiff's negligence claim is barred by the exculpatory clause in the

---

[10] The Court cites to a factual statement as "(AF)" when it is citing to plaintiff's additional statements of fact.

rental form. For clarity purposes, the Court notes that, to the extent a jury finds that the rental form was modified to include the replacement skis as listed equipment, then the exculpatory clause would bar plaintiff's negligence claim in light of the Court's finding *supra* that the clause is not ambiguous.

### C.    Gross Negligence

Turning to the supplement, the exculpatory clause does not bar plaintiff's claim of gross negligence. *Jones v. Dressel*, 623 P.2d 370, 376 (Colo. 1981). In Colorado, "[g]ross negligence is willful and wanton conduct, that is, action committed recklessly, with conscious disregard for the safety of others." *Hamill v. Cheley Colorado Camps, Inc.*, 262 P.3d 945, 954 (Colo. App. 2011). Willful and wanton conduct means "conduct purposefully committed which the actor must have realized as dangerous, done heedlessly and recklessly, without regard to consequences, or of the rights and safety of others, particularly the plaintiff." *U.S. Fire Ins. Co. v. Sonitrol Mgmt. Corp.*, 192 P.3d 543, 549 (Colo. App. 2008) (quoting Colo. Rev. Stat. § 13-21-102(1)(b)). Ordinarily, whether conduct was willful and wanton is a question of fact, but, "if the record is devoid of sufficient evidence to raise a factual issue, then the question may be resolved by the court as a matter of law." *Forman v. Brown*, 944 P.2d 559, 564 (Colo. App. 1996). Here, the Court does not believe that the record is *devoid* of evidence raising a factual issue as to Hotspur's conduct.

The evidence (including all disputes) construed in plaintiff's favor shows the following. The rental form requires a renter to agree that the release setting numbers appearing on the bindings correspond to the release setting numbers recorded on the form. (ECF No. 32-5 at 2.) The release setting numbers recorded on the rental form were for the set of skis rented to plaintiff on March 8th—the 13 KAR 167-20 set of skis. (*See id*.) At the end of the day skiing on March 8th, plaintiff returned the 13 KAR 167-20 skis because the tail end of one of the skis was delaminating and had a piece of tape stuck on the back of it that said "do not rent." (ECF No. 54-3 at 36:2-15.)

When plaintiff returned the original skis, the rental store was very busy to the point of being chaotic. (*Id*. at 79:6-8.)

One of Hotspur's employees, Joel Richards, provided plaintiff with a replacement set of skis, with the identifying number 12 KR 174-8. (ECF No. 32-5 at 2; ECF No. 54-5 at 16:5-17.) The replacement skis had Salomon Z12 bindings. (ECF No. 55-7 at 2.) The only change to the rental form was in changing the identifying number of the skis being rented. (ECF No. 32-5 at 2-3; ECF No. 54-6 at 73:21-25.) Richards would not typically show a rental form to a customer during an exchange of skis, so it was likely he did not show plaintiff's rental form to plaintiff. (ECF No. 54-6 at 75:12-20.) The Salomon Shop Practices Manual for 2013/14 provides that a rental store technician should point out the visual indicator settings on bindings' toe and heel pieces, and the renter must verify that the settings correspond to the settings recorded on the rental form. (ECF No. 55-14 at 4.) Hotspur expected its technicians to follow the Salomon Shop Practices Manual. (ECF No. 55-10 at 29:15-19.) Richards could not recall ever having seen the Salomon Shop Practices Manual (ECF No. 55-6 at 95:4-6, 15-17), but he would have used a "Salomon chart" to set the bindings on plaintiff's skis (*id*. at 73:8-16.) According to the "boss" of Hotspur's ski technicians, David Tunison, when a technician is swapping skis, the technician is required to show a customer the rental form and the visual indicator setting selected for the new skis. (ECF No. 55-9 at 17:24-18:1, 19:1-9.)

Richards does not recall pulling plaintiff's rental form and checking the visual indicator settings on the 12 KR 174-8 skis. (ECF No. 50-1 at 66:19-24.) Richards' normal procedure when swapping skis for a customer would be to speak with the customer, find a new set of skis, pull the customer's paperwork, ask the customer to provide a boot to reset the new skis, strike out the old set

of skis, and record the new set of skis. (*Id* at 66:25-67:19.) It was also not "uncommon" for Richards to double-check that everything had been filled out properly, and check the boot sole length. (*Id*. at 67:20-25.) Richards understands that the purpose of adjusting the visual indicator and forward pressure settings is to ensure that they function properly. (*Id*. at 37:3-12.) It is a ski rental store's responsibility to properly set the bindings. (ECF No. 55-10 at 12:23-13:1.) If ski bindings do not have the proper visual indicator setting, then a binding could prematurely release. (*Id*. at 18:1-10.) The correct setting for plaintiff was "8". (ECF No. 55-6 at 103:14-16.) Plaintiff's rental form suggests that the settings for the left and right heel are "5s". (*See* ECF No. 32-5 at 2.) Unless changes were made to the settings during an exchange of skis, Richards would not ask a customer to initial the rental form. (ECF No. 55-6 at 68:25-69:3.) According to Bayer, the probable cause for plaintiff's release from the bindings was that either the visual indicator setting or the forward pressure setting was inappropriately set. (ECF No. 30-1 at 7.)

In summary, Hotspur (through its various employees including Richards) was aware that the correct setting for plaintiff's bindings was "8," but provided him with new skis having inappropriate settings. Hotspur knew that it was its responsibility to properly set the bindings, and, if the bindings were not properly set, they could prematurely release. In other words, Hotspur acted purposefully in providing plaintiff with inappropriately set ski bindings, which Hotspur must have known was dangerous and without regard to plaintiff's safety given that it knew plaintiff could be prematurely released. This is the meaning of willful and wanton conduct. *See Sonitrol Mgmt.*, 192 P.3d at 549.

Although the facts surrounding the actual settings on the replacement skis are very much disputed, for present purposes that dispute falls on plaintiff's side. In that regard, notably, Richards does not recall whether he even checked the visual indicator settings on the replacement skis. Thus,

15

the only evidence supporting the position that the bindings on the replacement skis were properly set is, potentially, the rental form and the post-incident accounts of Wride and Tunison. As discussed *supra*, however, Bayer's testimony contradicts that of Wride and Tunison, especially given that Wride did not record the settings that he purportedly observed when the replacement skis were returned, and Tunison performed his evaluation of the same skis a day after they were returned. As for the rental form, even if the Court were to assume that the reason the setting numbers thereon were never updated was because Richards only recorded the settings of replacement skis if they differed from the original, this does not help the fact that a reasonable person reviewing the rental form could quite easily believe that at least two of the setting numbers are "5s"—specifically, the left and right heel. It is undisputed that the correct setting for plaintiff was "8" and Richards knew this. Thus, even if the Court were further willing to accept that Richards consulted the rental form in preparing the replacement skis, he still may have provided plaintiff with skis that he knew were not properly set.

Then there is the additional circumstantial evidence. For example, why did Richards not show plaintiff the rental form so that plaintiff could confirm the setting numbers? Hotspur asserts that Richards did not because it was "unnecessary for untrained customers to double check his work." (ECF No. 49 at 8.) That may be one way of looking at the situation. Another way of looking at the no-show of the rental form is that Richards was in a rush and wanted to move onto the next client (because the rental store was busy), or that Richards did not check the rental form or even the settings on the replacement skis to begin with (given that he cannot recall doing so). Added to this is the fact that three different sources required Richards to show plaintiff the rental form to confirm the setting numbers—the Salomon Shop Practices Manual, Hotspur itself, and the rental form.

Contrary to Hotspur's suggestion, considering requirements set by an employer or in a manual is not improperly creating a standard of care (*see* ECF No. 49 at 8-9),[11] instead, here, it may be considered evidence that Richards acted purposefully without regard for plaintiff's safety in consciously ignoring a known requirement related to the setting of plaintiff's bindings.

That being said, the Court does not find all of the evidence upon which plaintiff relies to be relevant to whether Hotspur acted willfully and wantonly. First, the failure to complete a "Crash Pack" form, which, apparently, is a form used following an accident involving injury. (*See* ECF No. 54 at 14.) While the failure to complete this form may be relevant to whether the bindings on plaintiff's second set of skis were properly set (in that, without the form, there is no contemporaneous recordation of the setting numbers on the bindings when they were returned following plaintiff's injury), plaintiff makes no attempt to explain why this failure is relevant to whether Hotspur acted willfully and wantonly when it provided plaintiff with the second set of skis. Instead, plaintiff conclusorily asserts that a jury could find gross negligence based upon the failure. (*See* ECF No. 54 at 14-16.) Plaintiff's own argument suggests that gross negligence was not in play, as plaintiff asserts that Wride, who received the skis after the accident, was not familiar with the policy requiring completion of a "Crash Pack" form and believed that it was a manager's decision whether to complete one. (*See id*. at 14-15.) As a result, under the circumstances of this case, the

---

[11] The Court notes that only one of the three cases Hotspur cites for this proposition involves Colorado law. The one case from Colorado that Hotspur cites actually illustrates the Court's point. In that case, *Grabau v. Target Corp.*, 2007 WL 4754044, at *4-6 (D. Colo. June 30, 2007), the court did not refuse to consider a company's policy because it set a standard of care, rather, the court did consider the company policy but found that failure to observe it did not show that the defendant had acted purposefully. Here, there is more than enough evidence showing that Richards acted purposefully in failing to follow the requirement of the rental form, given that he testified that it was his practice not to follow the same, or, as Hotspur puts it, given Richards' "belief that it was unnecessary for untrained customers to double check his work." (*See* ECF No. 49 at 8.)

failure to fill out a "Crash Pack" form simply has nothing to do with whether Richards, Wride, or Hotspur engaged in conduct realizing it was dangerous and without regard to plaintiff's safety. *See Sonitrol Mgmt.*, 192 P.3d at 549.

Second, renting allegedly damaged equipment to plaintiff and his companion prior to plaintiff receiving the replacement set of skis. Assuming for present purposes that evidence of prior misconduct (such as renting damaged or improperly set skis) is admissible (*see* ECF No. 49 at 10), the Court does not find such evidence to be relevant to whether Hotspur engaged in willful and wanton conduct in renting plaintiff the replacement set of skis. And plaintiff makes no adequate argument that such evidence is relevant, again conclusorily asserting that a jury could infer gross negligence. (*See* ECF No. 54 at 9-11.) Moreover, unlike the conduct at issue in the underlying claim of gross negligence (i.e., the rental of the replacement skis), plaintiff has presented no evidence that the prior rentals involved the improper setting of bindings, or Hotspur (or its employees) realizing a danger in renting the equipment.

In a more nebulous zone of relevance is evidence that, in setting bindings, Richards did not secure a "clip/release on the heel piece." (*See* ECF No. 54 at 12.) To be clear, the Court makes no ruling on this category of evidence, but notes the following matters. As an initial matter, to the extent this category of evidence has anything to do with a loose screw observed on the replacement skis by plaintiff's expert Stanley Gale, that observation occurred in November 2016 (*see* ECF No. 55-8 at 5, 26), more than two years after plaintiff's accident. As such, it has no relevance to whether there was a loose screw on the replacement skis at the time of the accident.

Putting that aside, the crux of this category of evidence appears to be testimony Richards gave pertaining to how he adjusted bindings to accommodate a customer's boot sole length.

According to plaintiff, in describing this adjustment, Richards omitted the "critical step of securing the clip/release on the heel piece …." (ECF No. 54 at 12.) Plaintiff appears to argue that this step is critical because it may cause a change in the forward pressure setting. (*See* ECF No. 54 at 12-13.) Hotspur asserts that the step is not critical because the heel piece is "spring loaded," and thus, returns to a closed position without the need for action from a technician. (ECF No. 49 at 7.)

Plaintiff will first have to explain his understanding of Richards' testimony because it appears that Richards may have talked about this issue when he stated that one of the steps was to "click the heel piece in, push down on the boot." (*See* ECF No. 55-6 at 88:21-22.) Plaintiff will next have to explain Bayer's statement in the declaration attached to the response to the supplement. Therein, Bayer states that a heel clip will remain in an up position "if the position of the binding is such that the clip is between positioning slots in the heel base plate." (ECF No. 55-16 at ¶ 1.) Bayer further states that, for the heel clip to drop into a locked position, "the heel binding needs to slide so that the clip aligns with a slot in the baseplate." (*Id*. at ¶ 2.) Bayer then states that "[t]his sliding movement of the binding will result in a change in the forward pressure setting." (*Id*.) Plaintiff appears to believe that this step is critical due to the change in the forward pressure setting, but, that change, according to Bayer, is brought about by "*[t]his* sliding movement of the binding." (*Id*.) (emphasis added). The use of "[t]his" indicates that Bayer is referring to the sliding movement mentioned in the previous sentence, but Bayer states that, that slide is necessary in order for the heel clip to lock into position. Thus, as far as the Court reads the declaration, it appears that Bayer is saying that a necessary sliding movement will result in a change to the forward pressure setting, rather than a failure to secure the heel piece.

Finally, plaintiff will need to explain why this evidence (assuming it suggests that which plaintiff contends) is relevant. Notably, the failure to secure a heel piece does not appear to be one of the reasons why Bayer opined that plaintiff was prematurely released. (*See generally* ECF No. 55-8.) In fact, it does not appear to be mentioned at all in Bayer's report. (*See id*.)[12] Given that Bayer's report is dated after Richards' deposition, and Bayer states that he reviewed Richards' deposition (*see id*. at 2), if this issue was as critical as plaintiff suggests, one would expect Bayer to have mentioned it in rather more detail in his report.

Nevertheless, as explained *supra*, the categories of evidence the Court has either excluded or not considered for purposes of the gross negligence claim, do not undermine the relevant evidence that plaintiff has presented pointing to triable issues of fact with respect to whether Hotspur acted willfully and wantonly in providing plaintiff with the replacement set of skis. As a result, the Court denies the motion for summary judgment/supplement to the extent it seeks dismissal of the gross negligence claim.

## III.    Conclusion

For the reasons set forth herein, the Court GRANTS in part and DENIES in part Hotspur's motion for summary judgment (ECF No. 32) and supplement (ECF No. 49) as follows:

- •    The motion for summary judgment is GRANTED with respect to the breach of warranty and strict product liability claims raised against Hotspur;

- •    The motion for summary judgment is DENIED with respect to plaintiff's simple negligence claim; and

- •    The supplement is DENIED with respect to plaintiff's gross negligence claim.

---

[12] In Bayer's report there is mention of a "loose heel piece," but Bayer says that was attributed to loose mounting screws. (ECF No. 55-8 at 4.)

**SO ORDERED.**

DATED this 21st day of June, 2017.

BY THE COURT:

_____
RAYMOND P. MOORE
United States District Judge